IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pennsylvania Liquor Control Board,    :
                           Petitioner    :
    :
           v.    :
    :
The Honorable Frank Burns,    :    No. 1159 C.D. 2019
                Respondent    :    Submitted: May 12, 2020


BEFORE:    HONORABLE P. KEVIN BROBSON, Judge
                HONORABLE CHRISTINE FIZZANO CANNON, Judge
                HONORABLE ELLEN CEISLER, Judge


OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE FIZZANO CANNON          FILED: June 16, 2020

The Pennsylvania Liquor Control Board (Board) petitions for review of the July 24, 2019 final determination of the Pennsylvania Office of Open Records (OOR) concluding that the records requested by the Honorable Frank Burns (Requester), Representative of the 72nd Legislative District, are not exempt from disclosure under the Right-to-Know Law (RTKL).[1] Upon review, we affirm.

## RTKL Request and Board Denial

On May 20, 2019, Requester submitted a RTKL request (Request) to the Board, seeking "[r]ecords that reflect the total number of restaurant liquor

___

[1] Act of February 14, 2008, P.L. 6, 65 P.S. §§ 67.101–67.3104.

licenses eligible for auction in each county as of May 10, 2019." Request at 1, Reproduced Record (R.R.) at 3.[2] The Board denied the Request, contending that the requested records contained confidential proprietary information exempt from disclosure under RTKL Section 708(b)(11), 65 P.S. § 67.708(b)(11), and that publicly disclosing the total number of licenses in each county that would be available for sale via auction in the future would create an unintended chilling effect on the market. Board's Denial at 2, R.R. at 7. The Board also asserted that the requested records contain information that pertains to its internal deliberations and strategies to implement and carry out the auction initiative and are, therefore, exempt from disclosure pursuant to RTKL Section 708(b)(10)(i)(A), 65 P.S. § 67.708(b)(10)(i)(A). Board's Denial at 1-2, R.R. at 6-7. Further, the Board maintained that although Section 470.3 of the Liquor Code,[3] as enacted by Act 39 of 2016, initially required the Board to post online a list of all licenses available for auction by March 15 of each year, that requirement was subsequently removed by Act 85 of 2016,[4] thus demonstrating legislative intent to render such information nonpublic. Board's Denial at 2, R.R. at 7.

## Appeal to OOR

On June 24, 2019, Requester appealed the Board's denial to the OOR, contending that the requested records constitute public records subject to disclosure

---

[2] Our citations to the Reproduced Record reference the page numbers of the PDF document, as the record is not properly paginated in accordance with Pennsylvania Rule of Appellate Procedure 2173.

[3] Act of April 12, 1951, P.L. 90, *as amended*, added by the Act of June 8, 2016, P.L. 273, 43 P.S. § 4-470.3.

[4] Act of July 13, 2016, P.L. 664, No. 85, § 24(4).

2

under the RTKL.  OOR Appeal at 1, R.R. at 10.  Requester asserted that the records at issue did not contain confidential proprietary information because the requested information is not commercial or financial, but simply a count of licenses.  OOR Appeal at 2, R.R. at 11.  Requester contended that the records "were not received by an agency, but rather have always existed within the agency."  *Id.*  Requester maintained that disclosure of the requested information would not harm the Board's competitive position as it "is the sole controller of the licenses and auctions."  *Id.*  Requester also claimed that the underlying liquor license data is already public information in Pennsylvania, as licenses are suspended in public board meetings; administrative law judge adjudications involving license violations, revocations and suspensions are posted publicly online in a searchable database; and a list of expired liquor licenses is available online through the Board's publicly available licensing database. *Id.*

Further, Requester asserted that the requested records did not contain information pertaining to the internal, predecisional deliberations of an agency, because a list or chart of the number of licenses available for auction in each county is merely a set of facts that does not reveal internal discussions or deliberations regarding a pending decision. *See* OOR Appeal at 2, R.R. at 11. *Id.* Countering the Board's reliance upon the legislative history of the Liquor Code, Requester further contended that a review of bill analyses and floor debates failed to reveal a specific legislative motive in amending Section 470.3.  OOR Appeal at 2-3, R.R. at 11-12.

**Position Statements and Affidavits**

On July 5, 2019, the Board submitted a position statement and several affidavits to the OOR.   Board's Position Statement at 1, 14, R.R. at 34, 48.  The

3

Board contended that the total number of restaurant liquor licenses that remain available for auction in each county in Pennsylvania constitutes a trade secret[5] and confidential proprietary information protected from disclosure under RTKL Section 708(b)(11). Board's Position Statement at 5, R.R. at 39. Claiming that disclosure would result in an "unwanted chilling effect" in "at least some counties," the Board stated that releasing the requested information "would be detrimental to [its] efforts in that it would give potential bidders a forward-looking view into the markets of each county that [is] likely to influence when they bid, how much they bid, or whether they even bid at all in any given auction." Board's Position Statement at 5-6, R.R. at 39-40. The Board further reiterated its previous contention that the requested information reflected its internal, predecisional deliberations and was, therefore, exempt pursuant to RTKL Section 708(b)(10)(i)(A), and also that factual information may still qualify under this exemption where disclosure would be tantamount to publication of an agency's evaluation and analysis. Board's Position Statement at 9-10, R.R. at 43-44.

The Board maintained that the repeal of certain disclosure requirements from Section 470.3 of the Liquor Code evidences legislative intent to hold as confidential the number of licenses available for auction by the Board in each county. Board's Position Statement at 10, R.R. at 44. Further, the Board raised the additional contentions that the requested records are exempt because their disclosure would result in a loss of funds to the Commonwealth and cause personal harm to

---

[5] Although the Board contended for the first time in its Position Statement that the requested information constitutes trade secrets, this assertion is not waived. *See Levy v. Senate of Pa.*, 65 A.3d 361, 380 (Pa. 2013) (holding that an agency does not waive the ability to assert a reason for denying a RTKL request on appeal by omitting the reason from the initial response).

4

existing licensees.[6]  Board's Position Statement at 12, R.R. at 46 (citing RTKL Section 708(b)(1)(i), (ii), 65 P.S. § 67.708(b)(1)(i), (ii)).

The Board submitted the affidavits of Jason Worley, Esq., its Deputy Chief Counsel, and Michael Vigoda, its Director of Legislative Affairs.  OOR Final Determination at 2, R.R. at 275.  Worley attested that he also serves as a Records Legal Liaison to the Board's Agency Open Records Officer, a position which involves assisting with responses to RTKL requests.  Worley Affidavit at 1, ¶¶ 3-4, R.R. at 72.  Worley stated that "[i]n addition to its regulatory responsibilities, the [Board] is tasked with operating like a business to generate revenue for the benefit of the Commonwealth and its citizens," and that Section 470.3 of the Liquor Code was enacted in order to enable the Board "to capitalize on the substantial value that restaurant liquor licenses have in Pennsylvania as a result of the county quota system established by [S]ection 461 of the Liquor Code, 47 P.S. § 4-461."  Worley Affidavit at 2-3, ¶¶ 8, 11, R.R. at 73-74.  Worley further attested as follows:

> 12. Prior to Act 39 of 2016, the county quotas were either already met or exceeded in most counties, if not every county, in Pennsylvania.
>
> 13. This meant that someone seeking to obtain a restaurant liquor license had to find an available license for sale on the open market, purchase the license for fair market value, and then seek [Board] approval to transfer the license.
>
> 14. Because of required disclosures made by applicants to the [Board] during the transfer application process, the [Board] developed a general awareness that restaurant liquor licenses were being sold for substantial sums of

---

[6] Although the Board did not assert these exemptions in its initial denial, these contentions are not waived.  *See supra* note 4.

money on the open market in many counties.

> 15. With this knowledge, the [Board] proposed to the Legislature the idea of auctioning expired restaurant liquor licenses as a way of generating additional revenue for the Commonwealth without having to issue more licenses in contravention of the established quota system.

Worley Affidavit at 3, ¶¶ 12-15, R.R. at 74.

Worley also indicated that the requirements to post all licenses available for auction by March 1 and to auction licenses by June 1 were omitted from Section 470.3 of the Liquor Code "when the [Board] determined that the total number of expired licenses available to auction statewide totaled approximately 1,200 licenses," such that "it became evident that adherence to these requirements would result in the markets becoming flooded and the value of each license significantly decreasing." Worley Affidavit at 4, ¶ 19, R.R. at 75. Thus, Worley noted that these amendments to Section 470.3 of the Liquor Code afforded the Board "more discretion in terms of when to auction the available licenses and what information to make available moving forward." Worley Affidavit at 4, ¶ 20, R.R. at 75. Worley acknowledged that "the [Board] has at times publicly disclosed the overall statewide number of licenses that it still has available to auction." Worley Affidavit at 5, ¶ 25, R.R. at 76. However, Worley maintained that, "with the possible limited exception of sharing information with Senate and/or House Appropriations leadership for purposes of making budgetary/fiscal projections around the time that [S]ection 470.3 was enacted and the first restaurant liquor license auction was conducted, the [Board] has not otherwise disclosed the breakdown of the total number of licenses available in each county." Worley Affidavit at 5, ¶ 26, R.R. at 76.

Worley attested that "if [the requested] information were to be [p]ublicly disclosed, it would[] improperly influence the current market for restaurant liquor licenses in each county, undermine the legislative intent behind [S]ection 470.3, and jeopardize what has otherwise been a successful strategy used by the [Board] to implement [S]ection 470.3 in the manner that is most beneficial to the Commonwealth and its citizens, as well as to existing restaurant liquor licenses." Worley Affidavit at 5-6, ¶ 28, R.R. at 76-77. Worley stated that market demand for liquor licenses is unique to each county, such that "the [Board] has been very careful in terms of when and how many licenses it chooses to auction in each county or area of the state at any one time." Worley Affidavit at 6, ¶¶ 29-30, R.R. at 77. Worley reasoned that "[d]isclosing the specific number of licenses that still remain available for auction in each county would be detrimental to the [Board's] efforts in that it would give potential bidders a forward-looking view into the markets of each county that are likely to influence when they bid, how much they bid, or whether they even bid at all in any given auction," thereby resulting in "an unwanted chilling effect" and either fewer bids or lower bid amounts in certain counties. Worley Affidavit at 6, ¶¶ 31-32, R.R. at 77. Worley also asserted that disclosing the requested information would "no doubt impact the value of the restaurant liquor licenses that are currently held by individuals or businesses in Pennsylvania" and that denying the request would serve the interests of not only the Commonwealth, but also existing restaurant liquor licensees." Worley Affidavit at 7, ¶¶ 33-34, R.R. at 78.

Vigoda attested that at various times, legislators have requested the number of licenses available for auction in each county, and that the Board "consistently declined to fulfill these requests, with the possible limited exception of sharing information with Senate and/or House Appropriations leadership for

7

purposes of making budgetary/fiscal projections around the time that [S]ection 470.3 was enacted and the first restaurant liquor license auction was conducted." Vigoda Affidavit at 1-2, ¶¶ 4-5, R.R. at 151-52. Vigoda also attested that divulging the requested information "would improperly influence the current market for restaurant liquor licenses in each county and would significantly undermine the [Board's] strategy and efforts to implement [S]ection 470.3 of the Liquor Code in the manner that is most beneficial to the Commonwealth and its citizens, as well as to existing restaurant liquor licensees." Vigoda Affidavit at 2, ¶ 7, R.R. at 152. Vigoda acknowledged that "the [Board] has at various times disclosed the total number of restaurant liquor licenses that remain available for auction statewide without revealing the breakdown of how many licenses remain available in each county, as such practice is not believed to be detrimental to the Board's strategy and efforts as described above." Vigoda Affidavit at 2-3, ¶ 8, R.R. at 152-53.

Requester submitted a position statement on July 9, 2019, contending that the requested information is necessary to assist legislators in voting on pending legislation. Requester's Position Statement at 2, R.R. at 169. Requester also asserted that the Board previously revealed the number of licenses available for auction before certain committees of the Pennsylvania House of Representatives and that this information was also available on certain news websites and legal blogs, which Requester attached to his position statement as exhibits. Requester's Position Statement at 2, R.R. at 170. Requester submitted an affidavit provided by Kari Orchard, Regional Caucus Director of the House Democratic Caucus Northwest Delegation, who attested that she attended a meeting at which the Board's Director of Regulatory Affairs, Tisha Albert, disclosed the number of licenses available for auction in a variety of counties that would be considered "oversaturated." Orchard

8

Affidavit at 1, ¶¶ 7-10, R.R. at 174.

Also on July 9, 2019, the OOR requested additional information from the Board and, in response, the Board submitted the relevant legislative history of Section 470.3 of the Liquor Code. OOR Final Determination at 2-3, R.R. at 275-76. On July 12, 2019, the Board submitted an affidavit provided by its Press Secretary, Shawn Kelly. Kelly Affidavit at 1, ¶ 1, R.R. at 248; *see also* OOR Final Determination at 3, R.R. at 354. Kelly attested that the Board has at various times received requests from reporters and the news media for lists showing the total number of restaurant liquor licenses available for auction in each county, but that the Board's Press Office has consistently declined to fulfill these requests. Kelly Affidavit at 1, ¶¶ 4-5, R.R. at 248. Kelly further attested that "disclosure of [the requested information] would improperly influence the current market for restaurant liquor licenses in each county and would significantly undermine the [Board's] strategy and efforts to implement [S]ection 470.3 of the Liquor Code in the manner that is most beneficial to the Commonwealth and its citizens, as well as to existing restaurant liquor licensees." Kelly Affidavit at 2, ¶ 7, R.R. at 249. Kelly acknowledged that the Board's "Press Office has also occasionally made limited comments to reporters or the news media about the number of licenses available in particular counties after it was determined that such comments would not have a negative impact on the [Board's] interests in conducting future auctions." Kelly Affidavit at 2, ¶ 9, R.R. at 249.

## OOR Final Determination

On July 24, 2019, the OOR granted Requester's appeal and ordered disclosure of the requested records. OOR Final Determination at 14, R.R. at 287.

The OOR rejected the Board's argument that the legislative history of Section 470.3 of the Liquor Code renders the disputed information nonpublic, further noting that the Board failed to point to any confidentiality provisions in the statute. OOR Final Determination at 6, R.R. at 257. The OOR reasoned that the decision of the General Assembly to amend Section 470.3 of the Liquor Code to "[r]eliev[e] the Board of the duty to create and post an annual 'listing' of licenses is not akin to saying that the underlying information is confidential." OOR Final Determination at 6 n.2, R.R. at 257.

The OOR concluded that the Board failed to establish that the total number of licenses available for auction by the Board for each county was exempt from disclosure as a trade secret pursuant to RTKL Section 708(b)(11), reasoning that the Board failed to demonstrate how other persons could derive economic value from possessing this information. OOR Final Determination at 10, R.R. at 261. The OOR pointed out that, regardless of whether the disputed information is accessible, the Board still determines "when and how many licenses it chooses to auction in each county." *Id.* (quoting Worley Affidavit at 6, ¶¶ 29-30, R.R. at 77).

The OOR also determined that the Board failed to establish that the requested records were exempt from disclosure because they contained confidential proprietary information pursuant to RTKL Section 708(b)(11), reasoning that the Commonwealth does not constitute a "person" for purposes of the definition of the term set forth in the RTKL. OOR Final Determination at 11, R.R. at 262 (citing RTKL Section 102, 65 P.S. § 67.102 (providing that information may constitute "confidential proprietary information" when its disclosure would result in "substantial harm to the competitive position of the person that submitted the information")). Further, the OOR concluded that the requested records were not

exempt under RTKL Section 708(b)(10)(i)(A), relating to internal, predecisional deliberations of the Board, reasoning that the disputed information "is purely factual" and "devoid of any deliberative character." OOR Final Determination at 13, R.R. at 264.

Lastly, the OOR determined that the Board failed to establish that the requested records were exempt from disclosure because they would result in the loss of Federal or State funds pursuant to RTKL Section 708(b)(1)(i). OOR Final Determination at 13, R.R. at 264. The OOR was not persuaded by the Board's argument that disclosure of the requested information could undermine its ability to generate revenue, reasoning that the Board should have "affirmatively state[d] that release of the information would result in actual loss of funding." *Id.* (citing *Cent. Dauphin Sch. Dist. v. Hawkins*, 199 A.3d 1005, 1016 (Pa. Cmwlth. 2018)). The Board then filed a petition for review with this Court.

## Discussion

On appeal, the Board argues that the OOR erred in failing to properly consider the legislative history of Section 470.3 of the Liquor Code and in failing to conclude that the information sought by Requester was subject to any of the exemptions noted above. We disagree.

We begin with an overview of the RTKL. "The objective of . . . [this] [l]aw . . . is to empower citizens by affording them access to information concerning the activities of their government." *SWB Yankees LLC v. Wintermantel*, 45 A.3d 1029, 1042 (Pa. 2012). Further, the RTKL is remedial in nature and is "designed to promote access to official government information in order to prohibit secrets, scrutinize the actions of public officials and make public officials accountable for

11

their actions." *Pa. Dep't of Educ. v. Bagwell*, 114 A.3d 1113, 1122 (Pa. Cmwlth. 2015) (citation omitted). "[C]ourts should liberally construe the RTKL to effectuate its purpose[.]" *Barnett v. Pa. Dep't of Pub. Welfare*, 71 A.3d 399, 403 (Pa. Cmwlth. 2013). "Consistent with the RTKL's goal of promoting government transparency and its remedial nature, the exceptions to disclosure of public records must be narrowly construed." *Bagwell*, 114 A.3d at 1122.

## Legislative History

In 2016, the General Assembly amended the Liquor Code through the addition of Section 470.3, 47 P.S. § 4-470.3, which originally provided, in relevant part:

> (a) A restaurant liquor license shall become available for auction by the [B]oard[7] under the following conditions:
>
> (1) the license has not been renewed under section 470;
>
> (2) the license has been revoked under section 471; or
>
> (3) the licensee has failed to meet the requirements under 474.1.[8]
>
> (a.1)(1) Subsection (a) shall apply to all restaurant liquor licenses that became available after December 31, 1999.
>
> (2) Any licenses not sold shall be available for sale at future auctions, provided, however, that no more than fifty

---

[7] More specifically, the Board is auctioning the right to apply for a license. *See* Section 470.3 of the Liquor Code, 47 P.S. § 4-470.3 (providing that "[a]fter the auction, the [B]oard shall provisionally award to the person making the highest bid for the license, the right to file an application for the license").

[8] Act of April 12, 1951, P.L. 90, art. IV, § 474.1, *as amended*, added by the Act of December 9, 2002, P.L. 1653, No. 212, § 21.

licenses shall be auctioned in any county per year.

(b) A license becomes available for auction by the [B]oard the day after the deadline has passed for appealing a decision revoking or not renewing the license or the day after the two-year window to file a renewal application nunc pro tunc under section 470 has passed.

(c) *The auction shall occur no later than June 1 of the calendar year after the license becomes available for auction and on a date to be determined by the [B]oard.*

(d) *By March 1 of each year, the [B]oard shall post on its publicly accessible Internet website a listing of all the licenses that are to be available for auction in June of that year. The list shall also be available upon request.*

(e) *The [B]oard shall accept applications from persons interested in bidding at the auction beginning March 1. The application shall be in writing and shall contain information as the [B]oard shall from time to time prescribe. The [B]oard shall accept applications until May 15 and may, in its discretion, accept applications after that date.*

Act of June 8, 2016, P.L. 273, No. 39, § 17.3 (effective Aug. 8, 2016) (emphasis added). The General Assembly amended this statute prior to its effective date by repealing subsections (c) through (e). *See* Act of July 13, 2016, P.L. 664, No. 85, § 24(4) (imd. effective) (Act 85) (stating, "Section 470.3(c), (d) and (e) of the act of April 12, 1951 (P.L. 90, No. 21), known as the Liquor Code, are repealed"). This amendment became effective immediately upon its passage on July 13, 2016. *See id.* Further, Section 24(3) of Act 85 provides, in pertinent part, that "[t]he General Assembly declares that the repeal [of subsections (c) through (e)] is necessary to

13

effectuate the addition of [S]ection 1799.3-E of the [Fiscal Code].["][9]  Act of July 13, 2016, P.L. 664, No. 85, § 24(3), R.R. at 198.  Section 1799.3-E of The Fiscal Code, in turn, provides that "[i]n order to encourage the auctioning of licenses under [S]ection 470.3 of . . . the Liquor Code, the [Board] shall set the dates, times and regulations for the auctioning of licenses."  72 P.S. § 1799.3-E.

Before this Court,[10] the Board argues that the OOR erred in failing to recognize that the legislative history of Section 470.3 of the Liquor Code reveals that the requested information is exempt from disclosure.  *See* Board's Brief at 19, 26.  The Board contends that the omission by the General Assembly of the requirement to publicly list licenses available for auction on its website and to otherwise make such licenses publicly available upon request evidences legislative intent to deem the information nonpublic.  *See* Board's Brief at 26.  The Board asserts that "[i]f the legislature had only intended to eliminate an obligation to create a list or eliminate the deadline for posting, it could have easily done so while still retaining language requiring information about the Board's inventory of expired licenses to be made publicly available upon request."  *Id.* at 26-27.  The Board therefore maintains that the above-outlined legislative amendments afford it the business discretion to determine not only when to auction expired licenses, but which information to make publicly available.  *Id.* at 23, 27.

The Board reasons that "[m]aintaining control over what information is made publicly available regarding the remaining inventory of expired licenses is critical to being able to effectively exercise such business discretion and generate

---

[9] Act of April 9, 1929, P.L. 343, *as amended*, added by the Act of July 13, 2016, P.L. 664, 72 P.S. § 1799.3-E.

[10] "This Court's standard of review of a final determination of the OOR is *de novo* and our scope of review is plenary."  *Hunsicker v. Pa. State Police*, 93 A.3d 911, 913 n.7 (Pa. Cmwlth. 2014).

14

revenue for the Commonwealth." *Id.* at 27 n.17. The Board relies on RTKL Section 306, which states that "[n]othing in this act shall supersede or modify the public or nonpublic nature of a record or document established in Federal or State law, regulation or judicial order or decree." *Id.* at 25 (citing 65 P.S. § 67.306). The Board also cites RTKL Section 3101.1, which provides that "[i]f the provisions of this act regarding access to records conflict with any other Federal or State law, the provisions of this act shall not apply." *Id.* (citing 65 P.S. § 67.3101.1).

Requester counters that reviewing the legislative history of Section 470.3 of the Liquor Code is unnecessary, because the intent of the legislature in enacting a statute may be gleaned from the words therein where it is clear and free from ambiguity. Requester's Brief at 13 (citing *Commonwealth v. Shiffler*, 879 A.2d 185, 189 (Pa. 2005)). Requester further contends that the requested records are not exempt from disclosure, because the Liquor Code does not include a confidentiality provision. *Id.* at 15. Regardless, Requester asserts that, assuming *arguendo* Section 470.3 of the Liquor Code is ambiguous, the relevant legislative history does not support the Board's position. *Id.* at 15-16. Requester maintains that omission of the obligation to post information regarding licenses available for auction does not in and of itself render such information nonpublic, as the plain language of the statute does not prohibit disclosure of the requested information. *Id.* at 16-17.

In essence, the Board argues that Section 470.3 of the Liquor Code renders the requested records nonpublic when read in conjunction with its legislative history. *Id.* at 25. Our Supreme Court has advised as follows regarding the role of legislative history in statutory construction:

> Our rules of statutory construction make clear that in interpreting statutes we must at all times seek to ascertain and effectuate the legislative intent underlying the

15

enactment of the particular statute(s). 1 Pa.C.S. § 1921(a). Where the words of a statute are clear and free from ambiguity the legislative intent is to be gleaned from those very words. Where, however, the statute is unclear or susceptible of differing interpretations, the courts must look to the necessity of the act, the object to be attained, the circumstances under which it was enacted and any legislative or administrative interpretations thereof. *Coretsky v. Bd. of Comm'rs of Butler Twp.*, . . . 555 A.2d 72 ([Pa.] 1989). In ascertaining the legislative intent of a particular statute it is presumed, *inter alia*, that . . . the legislature intends to favor the public interest as opposed to any private interest. *See generally*[] 1 Pa.C.S. § 1922.

*Pa. Fin. Responsibility Assigned Claims Plan v. English*, 664 A.2d 84, 87 (Pa. 1995). Thus, "[o]nly where the operative statutory language is not explicit in conveying the intent of the General Assembly should courts look beyond the General Assembly's words to ascertain its intent." *Pennsylvanians for Union Reform v. Pa. Dep't of State*, 138 A.3d 727, 731-32 (Pa. Cmwlth. 2016). Further, "we are mindful that when the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." *Shiffler*, 879 A.2d at 189 (citing Section 1921(b) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1921(b)) (brackets and quotation marks omitted). "As a general rule, the best indication of legislative intent is the plain language of a statute." *Commonwealth v. Bradley*, 834 A.2d 1127, 1132 (Pa. 2003).

Here, Section 470.3 of the Liquor Code manifests no ambiguity regarding whether the number of restaurant liquor licenses available for auction by the Board in each county constitutes public or nonpublic information. In fact, the Liquor Code does not address that subject at all. Thus, the Board's logic would deem ambiguous any statute which fails to address a particular subject or issue and

16

would result in the needless disregard of plain meaning in favor of alternate modes of construction. *See English*, 664 A.2d at 87. Further, we note that "[i]n order to constitute an exemption under Section 305(a)(3) of the RTKL,[11] the . . . statute must *expressly* provide that the record sought is confidential, private, and/or not subject to public disclosure." *Ali v. Phila. City Planning Comm'n*, 125 A.3d 92, 99-100 (Pa. Cmwlth. 2015) (emphasis added) (holding that the "Copyright Act[12] is not a federal law that exempts materials from disclosure under the RTKL" as "[i]t neither expressly makes copyrighted material private or confidential, nor does it expressly preclude a government agency, lawfully in possession of the copyrighted material, from disclosing that material to the public").[13] Thus, the Board fails to establish that Section 470.3 of the Liquor Code overcomes the presumption that the disputed records are public records. *See RTKL Section 305(a), 65 P.S. § 67.305(a).

---

[11] RTKL Section 305(a) provides as follows:

> General rule.--A record in the possession of a Commonwealth agency or local agency shall be presumed to be a public record.
>
> The presumption shall not apply if:
>
> (1) the record is exempt under section 708;
> (2) the record is protected by a privilege; or
> (3) the record is exempt from disclosure under any other Federal or State law or regulation or judicial order or decree.

65 P.S. § 67.305(a).

[12] 17 U.S.C. §§ 101-1401.

[13] We note that the General Assembly has expressly rendered other information accessible to the public under the Liquor Code. *See* Section 473(b) of the Liquor Code 47 P.S. § 4-473(b) (emphasis added) (stating that "[t]he names and addresses [of any person having a pecuniary interest in the conduct of business on licensed premises] shall be recorded by the board *and made available to the public as a public record*").

17

Further, the Board's interpretation runs counter to the presumption that the legislature intends to favor the public interest, in this case by promoting access to government information that will empower citizens to hold public officials accountable for their actions. *See* Section 1922 of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1922; *SWB Yankees LLC*, 45 A.3d at 1042; *Bagwell*, 114 A.3d at 1122. Moreover, we are not persuaded by the Board's argument that the repeal of subsections (c) through (e) demonstrates legislative intent to shield the disputed information from public access. While we acknowledge that "[a] change in the language of a statute ordinarily indicates a change in legislative intent," here, the legislative amendment evidences the General Assembly's intent to relieve the Board of the obligation to post the list of licenses available for auction and to hold the auction on a statutorily mandated date; it does not evidence any intent to shield the list of available licenses from public access. *Cf. Clearwater Constr., Inc. v. Northampton Cty. Gen. Purpose Auth.*, 166 A.3d 513, 520-21 (Pa. Cmwlth. 2017) (holding that "the General Assembly's conscious decision to amend [a] bill to exclude offerors from bringing a claim against a non-Commonwealth entity, while allowing them to pursue protests against the Commonwealth, [was] strong evidence of its intent to distinguish the two").

## RTKL Exemptions

Having established that the Liquor Code does not impede disclosure of the requested records, the relevant question becomes whether access may be denied pursuant to any exemption under the RTKL. The Board argues on appeal that the requested records are exempt from disclosure because they contained trade secrets and confidential proprietary information under RTKL Section 708(b)(11), because

18

they reflected internal, predecisional deliberations pursuant to RTKL Section 708(b)(10)(1)(A), and because they involved a loss of funds under RTKL Section 708(b)(1)(i). We will address each argument in turn.

## Trade Secrets and Confidential Proprietary Information

RTKL Section 708(b)(11) exempts from disclosure "[a] record that constitutes or reveals a trade secret or confidential proprietary information." 65 P.S. § 67.708(b)(11). These terms are not interchangeable and are analyzed separately for purposes of the exemption. *See Office of the Governor v. Bari*, 20 A.3d 634, 647-48 (Pa. Cmwlth. 2011).

## Trade Secrets

RTKL Section 102 defines the term "trade secret," in relevant part, as follows:

> Information, including a formula, drawing, pattern, compilation, including a customer list, program, device, method, technique or process that:
>
> (1) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and
>
> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

65 P.S. § 67.102. In addition, six factors are relevant in determining trade secret status under the RTKL:

19

(1) the extent to which the information is known outside of the business; (2) the extent to which the information is known by employees and others in the business; (3) the extent of measures taken to guard the secrecy of the information; (4) the value of the information to the business and to competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Mission Pa., LLC v. McKelvey*, 212 A.3d 119, 136 (Pa. Cmwlth. 2019), *appeals granted in part sub nom. McKelvey v. Pa. Dep't of Health* (Pa., Nos. 393, 394, & 396 MAL 2019, filed Jan. 28, 2020), *appeal denied*, (Pa., No. 395 MAL 2019, filed Jan. 28, 2020) (quoting *Smith v. Dep't Envtl. Prot.*, 161 A.3d 1049 (Pa. Cmwlth. 2017)). A trade secret "must be an actual secret of peculiar importance *to the business* and constitute competitive value to the owner." *Parsons v. Pa. Higher Educ. Assistance Agency*, 910 A.2d 177, 185 (Pa. Cmwlth. 2006). "The most important indicia for determining whether information constitutes a trade secret are 'substantial secrecy and competitive value to the owner.'" *Id.* (quoting *W. Chester Univ. of Pa. v. Schackner (Bravo Group, Inc.)*, 124 A.3d 382 (Pa. Cmwlth. 2015)). Further, this Court has noted previously, albeit under the former Right-to-Know Act,[14] that "the trade secret contention ceases to be of any moment when the function is recognized as governmental, rather than that of a private business[.]" *Hoffman v. Pa. Game Comm'n*, 455 A.2d 731, 733 (Pa. Cmwlth. 1983).[15]

---

[14] Act of June 21, 1957, P.L. 390, *as amended*, *formerly* 65 P.S. §§ 66.1–66.4, repealed and replaced by the Act of February 14, 2008, P.L. 6, 65 P.S. §§ 67.101–67.3104

[15] This Court has previously applied caselaw decided under the former Right-to-Know Act in construing exceptions that were preserved in the current RTKL. *See Delaware County v. Schaefer ex rel. Phila. Inquirer*, 45 A.3d 1149, 1156 n.10 (Pa. Cmwlth. 2012) (reasoning that "[b]ecause the 'personal security exception' historically encompassed, among other things, a right

The Board contends that the requested records contain "compilations" of information and, as such, fall squarely within the definition of "trade secret" set forth in RTKL Section 102. Board's Brief at 36-37 n.24 (citing 65 P.S. § 67.102). The Board further asserts that it has a business obligation to maximize revenue for the Commonwealth through the auctioning of restaurant liquor licenses. *Id.* at 36. The Board maintains that it is competing against private sellers in the market for restaurant liquor licenses, and that private sellers could use the requested information to their own advantage in determining whether and when to sell licenses. *Id.* at 33-35. Thus, the Board contends that the affidavits it provided support that disclosing the disputed information would result in a "chilling effect" in at least some counties by influencing bid amounts and the timing of public participation in license auctions, and would undermine "strategic advantage of being able to decide when and how many licenses to auction in a particular county without having to disclose that it still has additional licenses in that county to offer for sale at a later time." *Id.* at 34.

The Board acknowledges that it has shared the number of licenses available for auction in certain counties with Senate and House Appropriations leadership for purposes of making budgetary and fiscal projections around the time that Section 470.3 of the Liquor Code was enacted and when subsequently discussing potential legislation. *Id.* at 35-36. Nevertheless, the Board contends that this limited disclosure "does not change the fact that [it] has otherwise kept that information confidential, and it does not automatically make the full catalog of information public." *Id.* at 35. Further, the Board asserts that "to the extent that [its] Press Office has occasionally made limited comments to reporters or the news media about the number of expired licenses available in particular counties, this was done

to privacy, the Legislature's continued use of the 'personal security' language strongly indicates the Legislature intended to preserve the right to privacy under the current RTKL").

21

after it was determined that such comments would not have a negative impact on [its] interests in conducting future auctions." *Id.* at 36 (citing R.R. at 248).

Requester counters that the disputed records do not contain trade secrets, because this exemption "ceases to be of any moment when the function is recognized as governmental, rather than that of a private business," and while the Board may operate in a "business-like" manner, it is not a business. Requester's Brief at 20, 22 (quoting *Hoffman*, 455 A.2d at 733). Requester reasons that to the extent the Board generates profit, it does so for the benefit of taxpayers, such that by that reasoning all Commonwealth agencies operate as businesses. *Id.* at 22. Further, Requester asserts that the Board fails to demonstrate that the requested information possesses competitive value and maintains that the Board has no competition, as it is the chief regulator of liquor sales in the Commonwealth. *Id.* at 22, 23 (citing *Pa. Dep't of Revenue v. Flemming* (Pa. Cmwlth., No. 2318 C.D. 2014, filed Aug. 21, 2015)). We agree with Requester that the disputed information is not exempt from disclosure as a trade secret under RTKL Section 708(b)(11). The Board's acknowledgement that its Press Office has occasionally made comments to reporters or the news media about the number of expired licenses available in particular counties, the very information sought here by Requester, effectively precludes a finding that such information constitutes a "trade secret." Further, with respect to commercial enterprises undertaken by government agencies, our Supreme Court has opined that such enterprises remain "governmental functions" and that the government's entry into the "private sector" does not suggest a "diminished cause for openness." *SWB Yankees LLC*, 45 A.3d at 1042 (evaluating whether records in the possession of a government contractor directly related to the governmental function it had contracted to perform on behalf of the government were subject to

22

disclosure under RTKL Section 506(d)(1), 65 P.S. § 67.506(d)(1)). The Court explained that the Legislature would not be "naïve about the potential for inappropriate influences which have become a risk attending such," thereby militating "in favor of public scrutiny." *Id.*; *see also Parsons*, 910 A.2d at 186 (reasoning that "[a]lthough it competes with private lenders and others[,] [the Pennsylvania Higher Education Assistance Agency] is subject to the [RTKL], . . . and it may not conduct its affairs precisely as a private entity does," while nevertheless acknowledging "that some of the requested records may refer to secret information of competitive value").

Here, the Board's arguments in favor of the trade secrets exemption in fact undermine its own position by demonstrating that the requested information relates to its performance of a governmental function, thereby obviating the claimed exemption. The Board contends that Section 470.3 of the Liquor Code, when considered alongside its legislative history, reveals the nonpublic nature of the requested information. *See* Board's Brief at 19. However, this provision of the Liquor Code specifically authorizes the Board to conduct auctions for restaurant liquor licenses, thereby framing this duty as a governmental function. *See SWB Yankees LLC*, 45 A.3d at 1041. Further, each of the three affidavits offered by the Board asserts that holding restaurant liquor license auctions benefits the general public, yet another indicia of a governmental function. *See* Worley Affidavit at 5-6, ¶ 28, R.R. at 76-77; Vigoda Affidavit at 2, ¶ 7, R.R. at 152; Kelly Affidavit at 2, ¶ 7, R.R. at 249; *see also SWB Yankees LLC*, 45 A.3d at 1041.

The Board also emphasizes that it exercises business discretion in conducting restaurant liquor license auctions, maintaining generally that it performs a "unique business role." *See* Board's Brief at 23-24. However, as our Supreme

23

Court has noted, it is this very overlap with traditional private sector activities and "the departure[] from the more conventional confines of government" that necessitates "a reasonably broad construction of 'governmental function'" in order to further the objectives of the RTKL. *SWB Yankees LLC*, 45 A.3d at 1042. Thus, because conducting these auctions constitutes a governmental function, the Board cannot establish that the number of restaurant liquor licenses available for auction in each county is exempt from disclosure as a "trade secret" pursuant to RTKL Section 708(b)(11).

**Confidential Proprietary Information**

RTKL Section 102 provides the following definition of the term "confidential proprietary information":

> Commercial or financial information received by an agency:
>
> (1) which is privileged or confidential; and
> (2) the disclosure of which would cause substantial harm to the competitive position of the person that submitted the information.

65 P.S. § 67.102. "In determining whether disclosure of confidential information will cause 'substantial harm to the competitive position' of the person from whom the information was obtained, an entity needs to show: (1) actual competition in the relevant market; and[] (2) a likelihood of substantial injury if the information were released." *Dep't of Corr. v. Maulsby*, 121 A.3d 585, 590 (Pa. Cmwlth. 2015). In addition, "[c]ompetitive harm analysis is limited to harm flowing from the affirmative use of proprietary information by competitors," such that "[c]ompetitive

24

harm should not be taken to mean simply any injury to competitive position." *Id.* (internal citation and quotation marks omitted).

The Board notes that although the RTKL does not define the term "commercial information," its ordinary and common meaning is "viewed with regard to profit." Board's Brief at 37 n.25 (citing Merriam-Webster Online Dictionary). The Board contends that while the definition of confidential proprietary information in the RTKL "seems to suggest that [such information] must belong to a third party and be received by an agency, it does not logically follow that the legislature would have intended to give these protections to private businesses, but not a business operation run by the Commonwealth itself." *Id.* at 37 n.26. The Board also asserts that it has made extensive efforts to maintain the secrecy of the requested information. *Id.* at 38. Further, the Board maintains that it is in direct competition with private sellers of restaurant liquor licenses in the Pennsylvania market, and that disclosure of the requested information would cause substantial competitive injury by undermining "(1) its ability to make strategic business decisions regarding when to sell licenses and how many licenses to offer at any given time; and (2) its ability generate additional revenue for the benefit of the Commonwealth and its citizens." *Id.* at 28, 38.

Requester counters that the requested information does not constitute confidential proprietary information because the fact that the Commonwealth is not a "person" for purposes of RTKL Section 102, 65 P.S. § 67.102, precludes the Board from establishing that disclosure of the requested information would cause substantial harm to its competitive position. *Id.* at 25-26.

Black's Law Dictionary defines the term "commercial," in relevant part, as "[o]f, relating to, or involving the buying and selling of goods; mercantile"

25

and "[o]f, relating to, or involving the ability of a product or business to make a profit[.]" *Commercial*, Black's Law Dictionary (11th ed. 2019).[16]  Because restaurant liquor licenses are a regulatory tool, rather than a good, and, as established above, the Board is exercising a governmental function in conducting the auctions, it is not immediately apparent that the number of restaurant liquor licenses available for auction in each county constitutes commercial information.  However, assuming *arguendo* the disputed information constitutes commercial information, we nevertheless agree that the Board fails to establish that the requested records contain confidential proprietary information.

As noted above, RTKL Section 102 defines "confidential proprietary information," in relevant part, as "information *received* by an agency . . . the disclosure of which would cause substantial harm to the competitive position of the person that submitted the information."  65 P.S. § 67.102 (emphasis added).   Here, the Board does not receive the requested information from an outside party.[17] Rather, the Board accumulates such information as a result of its own administrative actions and assembles the same into a manageable list.  Indeed, the Board is tasked with administering and overseeing the statutory processes that would cause a

---

[16] "Words and phrases shall be construed according to rules of grammar and according to their common and approved usage; but technical words and phrases and such others as have acquired a peculiar and appropriate meaning or are defined in this part, shall be construed according to such peculiar and appropriate meaning or definition."  Section 1903(a) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1903(a).

[17] A review of relevant caselaw confirms that this exemption contemplates scenarios in which the information is submitted to the agency by a third party, such as a government contractor. *See, e.g.*, *Crouthamel v. Dep't of Transp.*, 207 A.3d 432, 441 (Pa. Cmwlth. 2019) (holding that the requested records, which contained information provided to the Department of Transportation by a third-party contractor and its subcontractor, were exempt from disclosure for containing confidential proprietary information pursuant to RTKL Section 708(b)(11)).

restaurant liquor license to become available for auction, whether through the lapse, revocation, or surrender of the license. *See* Sections 470, 471, and 474.1 of the Liquor Code, 47 P.S. §§ 4-470, 4-471, 4-474.1. Thus, to the extent the Board "receives" the disputed information, it does so either internally or from the independent office of the administrative law judge.[18] *See id.* The Board then decides "when and how many licenses . . . to auction in each county." OOR Final Determination at 10, R.R. at 261 (quoting Worley Affidavit at 6, ¶¶ 29-30, R.R. at 77). Hence, there can be no possibility of "substantial harm to the competitive position of the person that submitted the information." 65 P.S. § 67.102. Consequently, the Board cannot establish that requested records contain confidential proprietary information and are, thus, exempt from disclosure under RTKL Section 708(b)(11).

## **Internal, Predecisional Deliberations**

RTKL Section 708(b)(10)(i)(A) exempts the following from public access:

> A record that reflects . . . [t]he internal, predecisional deliberations of an agency, its members, employees or officials or predecisional deliberations between agency members, employees or officials and members, employees or officials of another agency, including predecisional

---

[18] The Office of Administrative Law Judge is an authority independent of the Board that adjudicates all citations against licensees issued by the Pennsylvania State Police Bureau of Liquor Control Enforcement. *See Office of Administrative Law Judge*, available at https://www.lcb.pa.gov/Legal/Office-of-ALJ/Pages/default.aspx (last visited June 15, 2020). *See also* Section 212 (a), (c) of the Liquor Code, 47 P.S. § 2-212(a), (c) (providing for the "creat[ion] within the [B]oard [of an] autonomous office to be known as the Office of Administrative Law Judge," consisting of administrative law judges who "shall preside at all citation and other enforcement hearings required or permitted under this act").

27

deliberations relating to a budget recommendation, legislative proposal, legislative amendment, contemplated or proposed policy or course of action or any research, memos or other documents used in the predecisional deliberations.

65 P.S. § 67.708(b)(10)(i)(A). "In order to demonstrate that the withheld documents are deliberative in character, an agency must submit evidence of specific facts showing how the information relates to deliberation of a particular decision." *McGowan v. Pa. Dep't of Envtl. Prot.*, 103 A.3d 374, 383 (Pa. Cmwlth. 2014) (internal citation and quotation marks omitted). "Only information that constitutes confidential deliberations of law or policymaking, reflecting opinions, recommendations or advice is protected as 'deliberative.'" *Carey v. Pa. Dep't of Corr.*, 61 A.3d 367, 378 (Pa. Cmwlth. 2013) (internal quotation marks omitted). However, "purely factual material is severable and, in general, should be disclosed even when it is located within a document containing exempted predecisional deliberations." *McGowan*, 103 A.3d at 386; *see also Township of Worcester v. Office of Open Records*, 129 A.3d 44, 61 (Pa. Cmwlth. 2016) (stating that "[f]actual information is not deliberative in character"). Nevertheless, "factual material can still qualify as deliberative information if its disclosure would so expose the deliberative process within an agency that it must be deemed exempted; or, in other words, when disclosure of the factual material would be tantamount to the publication of the [agency's] evaluation and analysis." *McGowan*, 103 A.3d at 387 (internal citation and quotation marks omitted).

The Board contends that "[t]he per county inventory of expired licenses is effectively a working list that [it] regularly uses to strategize and determine when and how many licenses to auction in a particular county or particular part of the state at any given time," such that this information "is predecisional in nature relative to

28

decisions that have not yet been made about conducting future license auctions[.]" Board's Brief at 41. Acknowledging that the requested information is factual in nature, the Board nevertheless maintains that disclosure thereof would expose its strategy and deliberative process. *Id.* The Board therefore asserts that disclosure of the disputed information "would give insight into how the [Board] is selecting licenses to auction in each county and how often in comparison to the available number of licenses," such that "prospective bidders and others would be able to make predictions about future auctions and use the information against the [Board] in trying to implement its strategy." *Id.* at 40-41. The Board contends that "[m]aking such information publicly available would also create the opportunity for third parties to lobby [the Board] an effort to exert outside influence on decisions that are made regarding the license auctions." *Id.* at 42. Requester counters that the disputed records do not reflect internal, predecisional deliberations, but rather contain factual information. Requester's Brief at 28.

Here, the Board's own argument demonstrates the inapplicability of the asserted exemption. The Board asserts that the requested information "is predecisional in nature relative to decisions *that have not yet been made* about conducting future license auctions[.]" Board's Brief at 41 (emphasis added). However, successfully invoking the exemption requires evidence of specific facts demonstrating how the information relates to deliberation of a *particular* decision. *See McGowan*, 103 A.3d at 383. Further, the Board admits that the disputed information is factual in nature. *See* Board's Brief at 41. Despite asserting that disclosure of these facts would nevertheless expose its strategy and deliberative process regarding the selection of licenses to auction in each county, we are unpersuaded such disclosure "would be tantamount to the publication of the

[agency's] evaluation and analysis." *McGowan*, 103 A.3d at 387 (internal citation and quotation marks omitted); *see also* Board's Brief at 40-41. As noted by the OOR and conceded by the Board, even with knowledge of the total number of restaurant liquor licenses available for auction in each county, the general public is still not privy to the number of licenses the Board will select for auction in each county and when each auction will take place. *See* Worley Affidavit at 6, ¶¶ 29-30, R.R. at 77; *see also* OOR Final Determination at 10 n.4, R.R. at 261.

We fail to discern how revealing raw data regarding the total number of licenses the Board could potentially select for auction in each county provides insight into any policymaking, recommendations, or other deliberative processes of the Board. *See Carey*, 61 A.3d at 378; *see also McGowan*, 103 A.3d at 386-89 (affirming in part, vacating in part and remanding to the OOR to conduct *in camera* review of two documents that were deliberative in nature to the extent they contained a summarized version of rough drafts of a final report of the Department of Environmental Protection regarding whether or not to re-designate a creek and "concern[ed] the Department's thought process in determining when to release the final report for public comment," yet also may have "contain[ed] qualitative or statistical data that [could] be severed from the deliberative portions of those documents"). Thus, the Board fails to demonstrate that the requested records are exempt from disclosure because they reflected internal, predecisional deliberations of an agency pursuant to RTKL Section 708(b)(10)(i)(A).

**Loss of Funds/Personal Security**

RTKL Section 708(b)(1)(i) exempts from public access "[a] record, the disclosure of which . . . would result in the loss of Federal or State funds by an agency or the Commonwealth[.]" 65 P.S. § 67.708(b)(1)(i).

The Board argues that the OOR erred in concluding that disclosure of the requested records would not result in the loss of funds to the Commonwealth for purposes of this exemption. Board's Brief at 42. The Board acknowledges that it does not receive Federal or State funding as part of its license auction initiative. *Id.* at 42-43. Nevertheless, the Board contends that Section 470.3 of the Liquor Code grants it the authority to generate additional revenue for the Commonwealth and that disclosure of the requested information would undermine this specific legislative purpose by undermining its ability to generate revenue. *Id.* at 43. The Board reasons that "[i]n at least some counties, where there is an abundance of licenses available," disclosure of the requested information "would more likely than not create an unwanted chilling effect resulting in fewer bids and/or less bid amounts." *Id.*

Requester counters that the Board fails to invoke the exemption contained in RTKL Section 708(b)(1)(i) because the affidavits it supplied attested only to the possibility that disclosing the requested information may result in a loss of revenue. Requester's Brief at 29-30.

We agree with Requester and the OOR that the Board's evidence fails to establish that the disputed records are exempt under RTKL Section 708(b)(1)(i). "Section 708(b)(1)(i) of the [RTKL] exempts from disclosure '[a] record, the disclosure of which *would result in* the loss of Federal or State funds by an agency or the Commonwealth[.]'" *Cent. Dauphin Sch. Dist.*, 199 A.3d at 1016 (emphasis in original) (quoting 65 P.S. § 67.708(b)(1)(i)). This exemption "requires more than

31

the mere possibility of a loss of [] funds." *Id.* Here, the affiants attesting on behalf of the Board merely posit that disclosing the requested information would improperly influence the current market for restaurant liquor licenses across the Commonwealth, resulting in lower bid amounts in some counties and undermining the Board's strategy in conducting auctions. *See* Worley Affidavit at 6, ¶¶ 31-32, R.R. at 77; Vigoda Affidavit at 2, ¶ 7, R.R. at 152; Kelly Affidavit at 2, ¶ 7, R.R. at 249.

We agree with the OOR that these vague affidavits do not carry the Board's burden in establishing the exemption as they merely speculate regarding the possible loss of future revenue. *See W. Chester Univ. of Pa.*, 124 A.3d at 393 (internal citation and quotation marks omitted) (stating that "[a]n affidavit must be specific enough to permit this Court to ascertain how disclosure of the entries would reflect that the records sought fall within the proffered exemptions" under the RTKL); *Pa. State Police v. Muller*, 124 A.3d 761, 765 (Pa. Cmwlth. 2015) (holding, for purposes of establishing an exemption from disclosure under the RTKL, that an "affidavit must be detailed, nonconclusory, and submitted in good faith"). Thus, the Board fails to establish that the requested information would result in the loss of state funds and is, therefore, exempt pursuant to RTKL Section 708(b)(1)(i).

Finally, the Board asserts that the OOR erred in failing to address its argument that the requested information is exempt from disclosure under Section 708(b)(1)(ii), 65 P.S. § 67.708(b)(1)(ii), because its disclosure would cause personal harm to existing licensees. Board's Brief at 44. While the OOR did err in failing to address this argument, such error was harmless.

RTKL Section 708(b)(1)(ii) exempts from public access "[a] record, the disclosure of which . . . would be reasonably likely to result in a substantial and

demonstrable risk of physical harm to or the personal security of an individual." 65 P.S. § 67.708(b)(1)(ii). In order for this exemption to apply, an agency "must demonstrate . . . (1) a 'reasonable likelihood' of (2) a 'substantial and demonstrable risk' to a person's personal security." *Delaware County v. Schaefer ex rel. Phila. Inquirer*, 45 A.3d 1149, 1156 (Pa. Cmwlth. 2012). This Court noted in *Delaware County* that a risk to a person's "personal security" may include "a threat to one's financial well-being." *Id.* at 1155 (citing *Times Publ'g Co., Inc. v. Michel*, 633 A.2d 1233, 1238 (Pa. Cmwlth. 1993), *superseded by statute as stated in Office of the Lieutenant Governor v. Mohn*, 67 A.3d 123 (Pa. Cmwlth. 2013)).

The Board contends that "any negative effects resulting from the disclosure of the requested list [would] also no doubt impact the value of the restaurant liquor licenses that are currently held by individuals or businesses in Pennsylvania." Board's Brief at 44. The Board maintains that disclosure of the requested information "may cause a significant decrease in the market demand for [restaurant liquor] licenses" available for transfer by licensees "in the private market because of potential purchasers being more inclined to wait to buy a license if they know the [Board] will be selling additional licenses in a particular county at some point in the future, or if there is an abundance of licenses available within their county." *Id.* at 45. The Board's arguments are misplaced.

First, the potential harm that the Board references is merely speculative, which this Court has previously found to be insufficient for application of the personal security exemption. *See Governor's Office of Admin. v. Purcell*, 35 A.3d 811, 820 (Pa. Cmwlth. 2011) (stating that "[m]ore than mere conjecture is needed" to establish the "personal security" exemption under the RTKL). Second, the potential harm that the Board references is not the type of harm that is generally

33

protected under the personal security exemption of Section 708(b)(1)(ii). This Court has interpreted the term "personal security" to "comprise innumerable rights, including the right to privacy and confidentiality, and the right to be secure in one's possessions, monies, investments and benefits, and the freedom from identity theft." *Delaware County*, 45 A.3d at 1155. Section 708(b)(1)(ii) has been traditionally applied to protect an individual's identifying information, such as a home address, birthdate, or social security number. *See Pa. State Educ. Ass'n v. Dep't of Cmty. & Econ. Dev.*, 148 A.3d 142, 144 (Pa. 2016) (holding that this "Court erred in ruling that there is no constitutional right to privacy in one's home address in connection with RTKL requests," and that this right "may not be violated unless outweighed by a public interest favoring disclosure"); *Purcell*, 35 A.2d 814, 821 (concluding that the "personal security" exemption protected the birthdates of state employees where disclosure would substantially heighten the risk of identity theft and fraud); *Times Publ'g Co., Inc.*, 633 A.2d at 1238 (holding that "public disclosure of [firearms] licensees' . . . social security numbers . . . is [] protected by the personal security exception to the [former Right-to-Know Act]," noting that "a person's social security number may be 'misused' to 'obtain a person's welfare benefits or Social Security benefits, order new checks at a new address on that person's checking account, obtain credit cards, or even obtain a person's paycheck'"). Thus, the Board could not establish that disclosure of the requested information would create "(1) a 'reasonable likelihood' of (2) a 'substantial and demonstrable risk' to a person's personal security." *Delaware County*, 45 A.3d at 1156.

Accordingly, albeit partially on other grounds discussed herein,[19] we affirm the final determination of the OOR.

_____
CHRISTINE FIZZANO CANNON, Judge

---

[19] This Court may affirm on grounds different than those relied upon by the court or agency below if such grounds for affirmance exist. *Belitskus v. Hamlin Twp.*, 764 A.2d 669, 671 (Pa. Cmwlth. 2000); *Continuous Metal Tech., Inc. v. Unemployment Comp. Bd. of Review*, 740 A.2d 1219, 1224 (Pa. Cmwlth. 1999).

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pennsylvania Liquor Control Board,    :
         Petitioner    :
         :
    v.    :
         :
The Honorable Frank Burns,    :    No. 1159 C.D. 2019
         Respondent    :

## O R D E R

AND NOW, this 16th day of June, 2020, the July 24, 2019 final determination of the Office of Open Records is hereby AFFIRMED.

_____
CHRISTINE FIZZANO CANNON, Judge